MUNICIPALITY NUMBER Two, Praying for the Opening of Benton Street, *v.* MAUNSEL WHITE and others.

Both the exercise of the right of eminent domain and the powers of taxation are limited under the Constitution, and there does not exist either in the Legislature or in any of the subdivisions of sovereignty, a power of apportioning taxation for public purposes, whether of a general or of local character, except on the principal of equality and uniformity.

The Act of March 30th, 1832, which authorizes the Mayor and Council of the city of New Orleans to open any street in the city of New Orleans, and directs that the owners óf all the lots adjacent to and fronting the part of the street to be opened, shall be assessed for their respective portions of the benefit derived from the improvement; and the Act of 1847, which provides that the owners of all property which may be benefited by laying out, opening and improving streets in conformity with existing laws, shall be bound to the municipality that has caused such improvements to be made, and within the limits of which such property is situated, for the amount of their propor-

tions of the benefit, are unconstitutional, such assessment being unequal and not being uniform. There is no other mode of apportioning a tax for such improvements which will be equal and uniform, but that of an ad valorem tax on all property holders within the district, or by paying expenses out of the funds derived from general taxation.

While the Constitution of 1845 was in force, the Act of the Legislature of 1832, declaring that the owners of all the lots adjacent to and fronting the part of the street, opened under its provisions, should be assessed for the respective portions of benefit derived from the improvement, was adjudged constitutional. Articles 105 and 123 of the present Constitution, were taken literally from the Constitution of 1845; it must be presumed that the framers of the present Constitution were aware of the construction they had received from the Supreme Court, and intended, in the new Constitution, they should have the same meaning and effect. The constitutionality of the Act of 1832 should therefore be maintained. *Slidell*, C. J., dissenting, with whom concurred *Campbell*, J.

*MUNICIPALITY No. 2. v. WHITE.*

APPEAL from the Fourth District Court of New Orleans, *Reynolds*, J. *J. R. Wolfe*, for plaintiffs. *Benjamin & Micou*, for opponents and appellants. *H. H. Strawbridge*, for *J. F. Wheeler*, opponent and appellant.

OGDEN, J. The questions involved in this case concern the constitutional rights and powers of a co-ordinate branch of the government, and have undergone the most mature deliberation of the court. The appellants, as owners of property contiguous to Benton street, which has been recently opened by the authority of an ordinance of the municipality, resist the payment of the amounts for which they have been respectively assessed for their properties, of benefit derived from this public improvement, on the ground that the several Acts of the Legislature, by which the whole burthen of paying the costs incurred for such improvements is imposed on the owners of property contiguous to the newly opened street, are repugnant to the Constitution, and therefore void. The two provisions of the Constitution which it is contended are violated by those Acts of the Legislature, are : First, the Article 105, which declares " no *ex post facto* law, nor any law impairing the obligation of contracts, shall be passed, nor vested rights be divested, unless for purposes of public utility, and and for adequate compensation previously made." Second, Article 123, which declares, " Taxation shall be equal and uniform throughout the State ; all property on which taxes may be levied in this State, shall be taxed in proportion to its value, to be ascertained as directed by law. No one species of property shall be taxed higher than another species of property of equal value, on which taxes shall be levied; the Legislature shall have power to levy an income tax and to tax all persons pursuing any occupation, trade, or profession." The Acts of the Legislature, said to be in opposition to these provisions of the Constitution, are the Acts approved March 30th, 1832, and 3d of May, 1847. By the first of these Acts, it is provided, that whenever, on the petition of such portion of the owners of property in the neighborhood, where any improvement of any street or public place is desired, as to the Mayor and Council of the city of New Orleans shall appear sufficient, and when the Mayor and Council shall deem such improvement necessary or highly useful, and also whenever it shall, in the opinion of the city council, be necessary or desirable for the public convenience or health, to lay out, form, and open any street or public place in any part of the city, they shall have the power to cause such street to be opened, widened or improved, and that the lots, buildings and improvements, whether of individuals or corporations, shall be taken, removed, and applied to that purpose, and compensation made to such owners for any loss or damage, exceeding the benefit and advantage derived to them from the improvement. The Act provides for the appointment of commissioners of estimate and assessment, and directs that the owners of all the lots adjacent to

and fronting the part of the street so opened, shall be assessed for their respective portions of the benefit derived from the improvement. The subsequent Act of 1847, provides that the owners of all property which may be benefited by laying out, opening and improving streets, in conformity with existing laws, shall be bound to the municipality that has caused such improvements to be made, and within the limits of which such property is situated, for the amount of their proportion of the benefit, when ascertained and finally determined.

In the case of the opening of Roffignac street, 7 Annual, the question arose under the Act of 1832, what precise meaning should be affixed to the expressions used in the statute limiting the assessment to the lots " adjacent to and fronting the street so opened." The court held, that the word adjacent was synonymous with contiguous, but that no property could be subject to assessment at a greater distance from the space taken for the public use, than the front line of a lot of sixty-five feet. The court say, in that case, " we have fixed upon the distance of sixty-five feet, because that dimension is the largest front of what may be denominated a full lot in New Orleans, and is as just a standard as we can think of." The appellants are owners of lots which are not so situated as to fall within the rule laid down by the court in that case as rendering them liable to be assessed ; but under the provisions of the Act of 1847, it having been ascertained and determined that they are benefited by the opening of the street, they are liable for the assessment and would be liable, no matter how distant their property may be from the newly opened street, if the Acts of the Legislature in question are to be deemed and held constitutional and valid.

In the case referred to, of the opening of Roffignac street, the constitutionality of the Act of the Legislature of 1832 was drawn in question, and the present Chief Justice of this court did not concur in the opinion of the majority of the court, but referred to the dissenting opinion delivered by him in the case of the opening of Euphrosyne street. In the views expressed by him in that case, we fully concur. The question, however, was then confined to the expropriation of the ground taken for the new street, and the dissenting opinion proceeded no further than a denial of the right claimed under the Act of the Legislature to take the property of an individual for the public use, and pay him for it in the real or supposed benefit done to his other property, instead of in money. We are now called on to decide, whether it is not equally a violation of the Constitution to compel individual proprietors determined on by the commissioners, as those most benefited by the improvement, to bear the whole burden or charge of an improvement thus made for the public benefit.

The principles of the Constitution invoked by the appellants, are of the highest importance, and were designed to render the rights of private property sacred and inviolable, and they do, from their nature, afford the most ample constitutional guaranty against any abuse of the legislative power. We cannot doubt that, however subdivided the State may be into cities, towns and parishes, those fundamental principles incorporated into the Constitution, must pervade the whole system of the body politic, and regulate and control all local legislation. There would be but little guaranty for the rights of property, if the dominion of the principles of the Constitution was not over all the subdivisions of legislative power throughout the State.

The power delegated by the Legislature of legislating for municipal or parochial purposes, must be exercised in strict conformity with the principles of

the Constitution, and the question is, whether consistently with the restrictions imposed by the two clauses in the Constitution referred to, the city corporation have the power of compelling a portion of the property owners residing in a certain locality, to pay for a public improvement made by authority of a local law of the municipality which the corporation would have no right to pass except for the benefit of the public for whom they are allowed to legislate. If such proprietors can be made to bear the whole share of such burthen, on the ground that they alone are benefited by it, on what principle does the right of the council to pass the ordinance rest? The power is not claimed for the council on any other ground than that of their right to legislate for the public good within the limits of the corporation. The words of the statute conferring the power are, that " whenever in the opinion of the council it shall be necessary for the public convenience or health to lay out, form, or open any street or public place in any part of the city." The private interests of individuals it was not intended should be regarded as a motive for the action of the council, in adopting the ordinance ; and yet the cost of making the improvement thus determined on as a means of public utility, is charged upon the individuals who are supposed to be the most benefited by it. The question we have to meet and decide is, whether the power thus claimed for the corporation, rightfully exists under the Constitution.

In arriving at a conclusion on this important question, we are much aided by the thorough investigation this whole subject has undergone in the State of New York, and though the decisions rendered by the courts there have not been uniform, and very different and conflicting views of the subject are presented in many of them, they serve to illustrate forcibly the construction we feel bound to give to our own Constitution in reference to the same subject matter. In the case reported in 6th Barlow's Supreme Court Reports, of *The People Ex Rel. Post et al.* v. *The Mayor, &c., of Brooklyn,* it was held that the exercise of such a right as is claimed in this case for the corporation, was a violation of an article of the Constitution of New York, which provides that private property shall not be taken for public use, without just compensation. In favor of the Mayor and Common Council of Brooklyn, it was contended, that the assessment was an exercise of the taxing power, and not an appropriation of private property to public use, and that it came within the legitimate scope of the taxing powers conferred on the corporation by the Legislature. In the Constitution of New York, there is no limitation on the power of the Legislature in regard to taxation, and, if regarded as a tax, the assessment was not obnoxious to any principle of their Constitution. After reviewing their conflicting decisions on this subject, the court, in that case, say : " If it was not otherwise manifest, these authorities establish the position that the assessment in question, is not a tax within the legal meaning of that term ; if it be not a tax, then it must be an attempt to take private property which requires a constitutional compensation, for there is no middle ground on which to stand" ; and the conclusion by that course of reasoning was arrived at, that the assessment was unconstitutional. This was not the decision of the Court of Appeals of New York, but we will now refer to what is said by that tribunal in reference to the above decision of the Supreme Court. In the case of *The People Ex relat. Griffin et al.* v. *The Mayor of Brooklyn,* in which case the same law was maintained to be constitutional, Justice Ruggles, who delivered the opinion of the court, places the decision expressly on the ground, that such assessments

are lawful and constitutional taxation. He says, "the assessment, therefore, was taxation, and not an attempt to exercise the right of eminent domain; if there be any sound objection to the assessment as a tax, it must be an objection which applied to the principle on which the tax is apportioned, because the object for which the money was to be raised is, without dispute, one for which taxation, by a different rule of apportionment, would have been lawful." He then proceeds to say, that " the power of taxation and of apportioning taxation, is vested exclusively in the Legislature, unless the power is limited and restrained by some constitutional provision; that the power of taxing, and the power of apportioning taxation, are identical and inseparable, and that since the original organization of the government of New York, there has not been any such constitutional limitation or restraint. The power is asserted by these decisions, for the Legislature, in the absence of any constitutional restriction whatever, to apportion taxation without reference to the locality, or to any proportion between the burthen and the benefit, and in express terms it is said that the power is vested exclusively in the Legislature, of assigning to each individual his share of the public burthens." In this very able decision of Justice Ruggles, several adjudicated cases are referred to, in which a distinction which had been drawn between street assessments and taxation, and in reference to the distinction thus attempted to be drawn, he says, "in no case has it been adjudged, that street assessments are not made by virtue of the legislative taxing power."

Applying the test of our own Constitution to the principles of law thus recognized and established by the decisions of the courts of New York, where this subject has been so fruitful of litigation, the question of the constitutionality of the assessment must be solved in the negative. Both the exercise of the right of eminent domain, and the power of taxation, are limited under our Constitution, and the rule with us is deduced not from general principles, but from the Constitution itself, that there does not exist either in the Legislature, or in any of the subdivisions of State sovereignty, a power of apportioning taxation for public purposes, whether of a general or of a local character, except on the principle of equality and uniformity. There appears to be no other reason for the distinction which has been drawn between an assessment and taxation, when resorted to for the purpose of defraying the expenses of a public improvement, than the fact, that the Legislature in 1832, thought proper to provide, that the costs and expenses of opening new streets in the city of New Orleans, which had been previously, under the Act of incorporation of the city, paid out of the public funds in the city treasury, should be thereafter paid by what is called assessments for benefits on the lots adjacent to the newly opened street. This Act had only the effect of shifting the burthen of the expense from the people at large, who paid city taxes, to individual proprietors of lots in the neighborhood; it was not the less a tax, because the burthen was imposed on a few property holders in the shape of what was called an assessment. There existed then no constitutional restriction of the power of taxation, or the exercise of eminent domain, and the validity of the Act of the Legislature, however unjust and liable to abuse, could not have been successfully impeached. Under our present Constitution it is different, unless we should hold that the article referred to, was not intended to apply to city or parish taxes. There is what may be called an *obiter dictum* to that effect, in the decision in *Second Municipality* v. *Duncan*, 2 Ann. 182, but we cannot subscribe to the correct-

Municipality
No. 2.
v.
White.

ness of the opinion expressed by the court on that point. We consider that the Constitution established equality and uniformity to be the principle of taxation throughout the State, in all its subdivisions of local sovereignty. No State government has ever been carried on without the delegation of the taxing power vested in the Legislature, to subordinate political bodies, as necessary for their existence; and when a principle is laid down in the Constitution in such broad terms, limiting the exercise of that power, we cannot suppose its operation was intended to be so restricted as to leave the subordinate bodies supreme in this respect. The power of taxation is a power of all others most liable to abuse; it was the object of the framers of the Constitution to guard against that abuse, and while all the persons and property within the limits of a district for which a local government is established, may be subjected to taxation by the delegated authority of such government, for purposes of public utility within those limits, the principle of equality and uniformity required 'by the Constitution, must be preserved in the apportionment of such taxation, whatever be the objects on which the tax is to operate, and this may be done without circumscribing the power of discriminating as to those objects—it being impossible to ascertain the precise degree of benefit which is derived by any or by all of the property holders within the district, from any public improvement that may be determined on by the local authorities, there is no other mode of apportioning a tax for such improvements which will be equal and uniform, but that of an ad valorem tax on all property holders within the district, or by paying the expenses out of the funds derived from general taxation, as was done previous to the Act of 1832. The objection, that in a large city the benefit of local improvements is not felt to an appreciable extent, except in the immediate vicinity of such improvements, applies equally to all public improvements. Those persons residing or owning property in the vicinity of such improvements, are generally the persons who are most benefited by the increased value given to their property, but as such improvements are made by the authority of laws which are made without regard to any private interests, but solely for the public welfare, it has never been supposed that, for the greater advantage thus incidentily derived by those in the neighborhood of the many improvements which are constanly carried on under the authority of general and of local legislation, could be taxed any higher than others, on account of such superior benefit to them.

The evil, that some are benefited more than others, while all must be equally taxed, results from the necessity of establishing districts by definite limits, within which the powers of a local government must be exercised, and is an evil, from its nature, inseparable from taxation under any form of representative government. But the evil complained of by the appellants, under the statutes of 1832, by which certain property holders within the district, according to the judgment of commissioners, are compelled to improve their property in a mode pointed out to them, and pay for the improvement such sums as the commissioners may deem equivalent to the benefit derived by them, would seem to be an invasion of the private right of property, inconsistent with any but a despotic government.

In the case of *Blanchet* v. *Municipality No. Two*, 13 L. R. 325, which was an appeal from a judgment confirming the report of commissioners under the Act of 1832, for widening Notre Dame street, it was contended that the widening of the street was a general benefit to the whole community, and that its funds should have been made to contribute to the improvement under the eighth

58

section of that Act, which declares that, if the commissioners deem the improvement to be one tending to the salubrity, beauty, benefit, or improvement of the whole city, it shall be their duty to assess such part of the improvement to the Mayor and city, as they may deem equitable. The District Court had decided that the improvement was not sufficiently and generally useful or important to make it the subject of a tax on the municipality, and in confirming that decision, Judge Martin says : " The Legislature has thought fit to constitute the commissioners the sole judge of the cases in which the improvements are of so general a nature, as to demand that the charges attending them should not be borne by the inhabitants in the vicinity of which they are made alone, but by the whole community." The courts of justice, he remarks, are open to to those who may be aggrieved by the abuse of the powers of the commissioners, but that in the case before them, clamors had been heard, but there was no proof that the parties are aggrieved. We cannot believe such a decision could have been made under the present Constitution of our State. At that time, there was no constitutional objection to the law, whether viewed in the light of a tax or not, the power of the Legislature was then unrestricted, both as regards taxation, and the power of taking private property for public use, and against the abuses of such an extraordinary power over the property and rights of individuals, there was no protection except the very inadequate one furnished by the supervision of the courts over the acts of the commissioners; and after all, there being no certain standard for the judgment of either the commissioners or the courts, an irregularity in the imposition of the burthens and charges of public improvement was the necessary result. Since that time, there have been two conventions called, and in both the Constitutions framed by them, it was thought proper to insert the clauses above referred to, which did not exist in the old Constitution, and which, by their letter as well as by their spirit, are in opposition to such legislation. In the case of *Oakey* v. *The Mayor et al.* 1 L. R. 1, in which the constitutionality of an ordinance of the municipality laying a tax for paving the streets was considered, the court were influenced by the fact on which considerable stress was laid, that there was nothing in the Constitution then existing, which required taxation to be uniform, although, if there had been, it is probable they would have sustained the ordinance, on the ground which is stated, that as the tax fell alike on all who stood in the same situation, it was as uniform as any taxation could well be in relation to the subject matter, and on that principle we are not prepared to say, there could be any valid objection to our present laws, which provide a uniform mode of defraying the expenses of grading and paving the streets; but the question involved by the law assessing the owners of contiguous lots for benefits arising from the opening of new streets, is altogether different—it seems to us equally repugnant to both of the clauses of the Constitution invoked by the appellants.

The powers of the corporation which may be exercised without infringing the Constitution, are ample for all purposes of public utility. Their right to impose fines, forfeitures, and penalties for violation of or non-compliance with such regulations as may be prescribed for the general benefit of the inhabitants, is recognized by the Constitution, but their power in that respect as well as in regard to laying taxes, has been guarded against abuse by the Article in our present Constitution, which did not exist in the old one, granting an appeal to this court, in such cases, no matter how small the sum in controversy may be,

when the constitutionality or legality of such tax, fine, penalty or forfeiture, may be in contestation. We feel that the constitutional guarantees of the right of private property and the freedom from any other than equal and uniform taxation, with the right of appeal to this court to enforce them, would be of little avail, if we denied to the appellants the relief which they seek in the present case.

It is therefore ordered, adjudged and decreed, that the judgment of the court below be reversed, and the proceedings in the court below be dismissed at the costs of the appellees in both courts.

Justices VOORHIES and BUCHANAN, concurring.

SLIDELL, C. J., dissenting. I was inclined to withdraw from the decision of this cause, having some interest in the question by reason of proceedings now in progress with reference to another proposed public improvement. But I was advised by my brethren, that I had no legal ground for withdrawal, and that, on the contrary, it was my duty to take part in the decision of the present cause. I shall therefore briefly state my views.

The subject of assessment under the Act of 1832, underwent elaborate argument before the Supreme Court, organized under the Constitution of 1845. The subject being deemed of great public importance, the case was held under advisement for a long time; and the decision, under all these circumstances, must be regarded as the result of a diligent and deliberate judicial investigation by the court of last resort.

In the case of the opening of Euphrosine and Roffignac streets, to which I refer, I dissented upon the question as to the mode of paying a proprietor whose land is taken for public use; but did not differ upon the question of assessing proprietors of lots fronting upon, or adjacent to the proposed improvements. The other members of the court were unanimous in the opinion delivered by the Chief Justice, and, to the best of my recollection, I concluded that in future cases, I would consider the whole doctrine as settled.

Such would probably have been my course, if other cases of assessment under this Act had come before the former court under the Constitution of 1845. There is greater reason for a similar concurrence under the present Constitution. The reason is this. The Articles 105 and 123 of our present Constitution, are taken literally from the Constitution of 1845. Both relate to subjects of the gravest importance. In copying those words from the Constitution of 1845, we must presume the framers of the present Constitution were aware of the construction they had received from the Supreme Court, and intended that, in the new Constitution, they should have the same meaning and effect. I have no doubt that in framing the instrument, the cautious preservation of the very words in this and several other cases, was dictated by the important consideration, that they had been the subject of judicial interpretation. I conceive the interpretation of a new Constitution to be eminently a case in which the judicious maxim should be applied—Si de interpretatione legis quæratur, in primis inspiciendum est quo jure civitas retro in ejusmodi casibus usa fuisset. See also *McKee* v. *Ellis*, 2 Ann. 166, and the able arguments of council as there reported.

I have felt it my duty to give expression to this theory of constitutional interpretation, because this court is now at the outset of its career; and it is of grave importance that some landmarks of constitutional interpretation should be designated.

MUNICIPALITY
No. 2.
v
WHITE.

Let it be observed, that in the following cases, the operation of the Act of 1832, after the adoption of the Constitution of 1845, was either expressly or tacitly recognized : *Matter of Claiborne street*, 4 An. 7.   *Matter of Exchange Alley*, 4 An. 4.   *Mallard* v. *City of Lafayette*, 5 An. 112.   *Municipality No. One* v. *Young*, 5 Ann. 362.   *Boulat* v. *Municipality No. Two*, 5 An. 363.   *McLaughland* v. *Municipality No. Two*, 5 An. 504.   *Matter of Roffignac street*, 7 An. 77.   *Matter of Euphrosine street*, 7 An. 72.   Moreover, an Act similar to that of 1832 was enacted in 1846, to provide for opening and improving streets and public places in the city of Lafayette.   Acts of 1846, p. 138, sec. 4.

I may add, as not inappropriate to the subject of constitutional interpretation, that three of the Judges who occupied seats in the court which has recently gone out of existence, were members of the convention of 1845, among them the late Chief Justice, who was a prominent member of the Judiciary Committe in that convention, and whose recent retirement from the bench I deem a public loss.

In conclusion upon a subject which I consider a matter of settled doctrine, and no longer *res nova*, I think it not improper to add a few words respecting the theory of the Act of 1832.

Its object is to avoid the injustice of general taxation for a special local object.   It professes to apportion the assessment according to the maxim, that he who receives the advantage, ought to sustain the burden, and to exact from each of the parties assessed, no more than his just share of the burden according to this equitable rule of apportionment.   See *People* v. *The Mayor of Brooklyn*.   New York Court of Appeals, and cited by Eustis, C. J., in the case above mentioned.

At the same time as such improvements may be not only productive of local advantage, but also tend to the salubrity and benefit of the whole city, the statute provides that in such cases a just and equitable portion of the expense may be assessed upon the city.

There is more justice in this theory than in making the city treasury, which is the result of the contribution of all the inhabitants, pay the whole expense of an improvement enuring, in a considerable degree, to the special advantage of a few.

It is upon this principle, that for many years the expense of paving has been apportioned between the municipal or city treasury, and the owners of property fronting on the street paved.   See *City of Lafayette* v. *Orphan Asylum*, 4th Ann. 2.

To illustrate the equity, let us suppose a case.   It is proposed to open a public square in that portion of the city formerly known as Lafayette.   It is obvious that a proprietor of a dwelling house, fronting on the contemplated square, will derive a greater benefit than the proprietor of a dwelling house at the other end of the city, some miles off, in the late 3d Municipality.   It would be unjust they should both bear the burden in equal proportions, as would be the case if the improvement were paid for out of the city treasury, whose coffers are filled by the contribution of the landed proprietors of the whole city.

I concede that the system of local assessment is liable to abuse, for which reason courts should scrutinize its application with care, and also see that an equitable share of the burden should be borne by the public.   But it will be

readily foreseen, that if the whole charge of local improvements is to be borne by the city treasury, grievous abuses might be practised upon the inhabitants generally, to subserve the local interests of designing men holding property in a particular neighborhood.

CAMPBELL, J.   I concur in the opinion of the Chief Justice.